IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| ADOLFO MOYA SALAZAR, JR.,<br>Institutional ID No. 01811309,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO B. GIANNOTTI,<br><br>Defendant. | § § § § § § § § § § § § | Civil Action No. 1:26-CV-00057-BU |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Adolfo Moya Salazar, Jr., an inmate at the Texas Department of Criminal Justice (TDCJ) Wainwright Unit, brings this action against Defendant Alberto B. Giannotti, alleging that he violated his constitutional rights. Salazar's claims are subject to judicial screening under 28 U.S.C. §§ 1915, 1915A because Salazar has been granted leave to proceed *in forma pauperis*, Dkt. No. 6, and he sues government officials, *see* Dkt. No. 1. For the reasons below, Salazar's claims should survive judicial screening.

## I. JURISDICTION

Salazar brings his claims under 42 U.S.C. § 1983, providing the Court with subject-matter jurisdiction under 28 U.S.C. § 1331. Dkt. No. 1. Venue is proper in the Northern District of Texas, Abilene Division, because Salazar's claims arise from his incarceration at the TDCJ Robertson Unit located in Jones County, Texas. 28 U.S.C. § 1391(b)(2). The undersigned has the authority to enter these Findings, Conclusions, and Recommendations

1

after United States District Court Judge James Wesley Hendrix transferred Salazar's case to the undersigned for preliminary screening under Special Order 3. Dkt. No. 7; 28 U.S.C. § 636(c)(1). Salazar has not consented to the undersigned exercising the full jurisdiction of this Court.

## II.  FACTUAL BACKGROUND

For purposes of screening a plaintiff's complaint under 28 U.S.C. §§ 1915(e)(2)(B) or 1915A, a court must accept well-pleaded factual allegations as true and construe them in a way that most favor the plaintiff. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). A court may look to the plaintiff's allegations in their complaint, responses to a questionnaire, authenticated prison or jail records, and testimony provided at a *Spears* hearing. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *see also Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may consider authenticated medical and prison records).

Salazar's claims arise from an incident that occurred on July 3, 2025. Dkt. No. 1 at 4. Salazar alleges that at around 5:00AM, Salazar splashed Correctional Officer (C.O.) Giannotti with toilet water and feces through the food slot in his cell. *Id.* The water and feces did not cause Giannotti any physical harm; after getting splashed, Giannotti "put the food tray carrier on [his] slot to block [him]." Dkt. No. 13 at 2.

Roughly one or two minutes later, Salazar knocked the food tray away from the food slot. Dkt. No. 13 at 2. Giannotti then threw a full pitcher of boiling hot coffee at him. Dkt. Nos. 1 at 4; 13 at 1–2. Giannotti resorted to throwing scalding hot coffee at Salazar instead of using chemical agent or calling an Incident Command System (ICS). Dkt. No. 1 at 4.

2

The coffee splashed across Salazar's left leg his left knee was primarily affected, while his "thighs and privates also felt the burn." Dkt. No. 13 at 1. Salazar claims that Giannotti intended to strike his naked upper body; had he not moved in time, his chest would have been burned instead. Dkt. No. 1 at 4.

Salazar jumped back and started ripping off his boxers because he was burning. Dkt. No. 13 at 3. Giannotti looked into the cell to "see his work;" when Salazar ran "back to [the] slot and threw a tray at him," Giannotti finally stepped back from the door and called rank. *Id.* Salazar was provided with medical care shortly after the incident, but was still left with second-degree burns on his leg and permanently scarred skin. Dkt. No. 1 at 4.

Salazar alleges that the above incident was part of an ongoing series of similar altercations between himself and Giannotti; the fourth in as many days. Dkt. No. 1 at 4. In fact, Salazar and Giannotti had "got into it" while he was still in D-Pod, before even the first of these four altercations. Dkt. No. 13 at 3. Salazar claims that Giannotti was a "drug mule for a crime family [Salazar] knew," and would target Salazar to keep himself off the radar and present himself as a "good officer." *Id.* at 4.

The first incident occurred on or around June 30, 2026, after his transfer from D-Pod to F-Pod. Dkt. No. 13 at 3. Giannotti allegedly began "messing with [Salazar's food] slot," which made Salazar feel targeted. *Id.* When Salazar asked him to leave, Giannotti retorted that he "wasn't gone [sic] stop messing with [him]." *Id.* Salazar said he would "get [Giannotti] away from working around [him]," which Giannotti insisted was "not happening." *Id.* Salazar then "dashed" Giannotti—presumably with water and feces—and received a disciplinary case. *Id.*

The second incident occurred the next day, on or around July 1, 2026. Dkt. No. 13 at 4. Giannotti was again working Salazar's pod, and they "started talking crap to each other again." *Id.* Giannotti picking on Salazar to make himself look like a good officer "pissed [Salazar] off," so he splashed Giannotti a second time; Salazar was again written up following this incident. *Id.* The third incident occurred the following day, on or around July 2, 2026. *Id.* Giannotti was again working Salazar's pod; as Salazar saw him coming to do his count, he splashed him again—apparently without provocation—and received yet another disciplinary case. *Id.* Neither Giannotti nor Salazar were ever injured during these prior interactions. *Id.* at 3–4.

This all led to the final interaction on July 3, when Giannotti splashed Salazar with coffee following his fourth spritzing. After this final incident, ran finally split Giannotti and Salazar up. Dkt. No. 13 at 4. Salazar claims that Giannotti was later caught smuggling drugs into the prison, fired from his position, and booked into county jail. *Id.*

### III.  THE PARTIES

The sole defendant Salazar asserts claims against in this case is C.O. Alberto B. Giannotti. The undersigned finds no need to add further defendants at this time.

### IV.  LEGAL STANDARDS

A court must dismiss a complaint filed *in forma pauperis* or filed by a prisoner against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B); 1915A(b) (applying section to any suit by a prisoner against certain governmental entities,

regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly, it lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more

than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–679). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## V. ANALYSIS

Liberally construing Salazar's pleadings, he raises but one claim against Giannotti—an Eighth Amendment excessive force claim based on his use of coffee to discipline him rather than chemical agent or an ICS call.

The Eighth Amendment prohibits prison officials from using excessive force against convicted inmates. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Byrd v. Harrell*, 48 F.4th 343, 347 (5th Cir. 2022) (quoting *Hudson*, 503 U.S. at 7).

This assessment of the prison official's "subjective intent" is made "by reference to the well-known *Hudson* factors." *Byrd*, 48 F.4th at 347 (quoting *Cowart v. Erwin*, 837 F.3d 444, 452–53 (5th Cir. 2016). These factors include, but are not limited to, the following: "(1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response." *Bourne v. Gunnels*, 921 F.3d 484, 491 (5th Cir. 2019) (cleaned up). An assessment of the prison official's intent necessarily requires consideration of the totality of the circumstances, particularly the "progression of events" preceding the use of force. *Martin v. Seal*, 510 F. App'x 309, 313 (5th Cir. 2013) (per curiam).

While it is theoretically possible for one factor to "overshadow the others" such that it is dispositive, this is rarely the case. *Martin v. Seal*, 510 F. App'x 309, 313 (5th Cir. 2013) (per curiam). In particular, there is no requirement that a prisoner suffer significant injury;

the assessment turns on the nature of the force, rather than the extent of the injury. *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). However, the Eighth Amendment does not apply to "*de minimis* uses of physical force,*"* unless it is "of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley v. Albers* 475 U.S. 312, 327 (1991)). The factors laid out in *Hudson* are also not exclusive; courts may consider additional relevant factors as the case demands.[1]

Applying the *Hudson* factors to the facts alleged by Salazar produces an inconclusive result. The extent of the injury alleged plausibly indicates that the force used was excessive; the Fifth Circuit has posited that it did "not believe conduct resulting in first and second degree burns"`—such as those suffered by Salazar, Dkt. No. 1 at 4—"may be considered *de minimis*." *Lane v. Bynum*, 196 F.3d 1256, 1256 (5th Cir. 1999) (quoting *Williams v. Blackburn*, No. 91-3373, slip op. at 16 (5th Cir. Dec. 29, 1993) (unpublished)). It likewise appears that the force actually used was plausibly disproportional to the need for force; as Salazar himself notes, there were more appropriate alternatives to the use of boiling hot coffee against him, such as calling an ICS or using chemical agent. Dkt. No. 1 at 4. Thus, *Hudson* factors one and three plausibly support Salazar.

While the force used exceeded any existing need, it appears implausible that there was *no* need for force—a fact Salazar appears to concede based on the above identification of alternatives. The Court also notes that Salazar's conduct formed part of a pattern of

---

[1] *Hudson*, 503 U.S. at 8 (noting that extent of injury is "one factor that may suggest" force was unnecessary, and that the remaining factors "may also be proper to evaluate"); *Rankin v. Klevenhagen*, 5 F.3d 103, 107 n. 6 (5th Cir. 1993) (noting that the *Hudson* factors are "not an exhaustive listing of pertinent considerations").

repeatedly disruptive and inappropriate behavior from the prior days. Dkt. No. 13 at 3–4. Based on his allegation, it appears the "dashing" of water and feces on July 3–4 was also entirely unprovoked.[2] Taking this "progression of events" into account, it is implausible that there was *no* need to apply force in order to restore discipline. *Martin*, 510 F. App'x at 313. And it is undisputed that Giannotti called rank shortly after the use of force, and that Salazar was then provided medical treatment. Dkt. Nos. 1 at 4; 13 at 3. Thus, *Hudson* factors two and five do not plausibly support Salazar.

This leaves the fourth *Hudson* factor—the threat Giannotti reasonably perceived—as indeterminate. Salazar alleges that Giannotti was not injured during the prior three incidents, and the fourth incident was essentially identical. Dkt. No. 13 at 3–4. But the outcome of *prior* incidents would not definitively establish the risks that *future* incidents could present; Giannotti could still reasonably perceive a risk that Salazar might further escalate his actions to "get [Giannotti] away from working around [him]." *Id.* at 3. Salazar also alleges that he knocked away the food tray placed by Giannotti, a factor that was not present in the prior incidents and that would alter the risk Giannotti could have reasonably perceived. *Id.* at 2–4. Thus, while it is plausible that Giannotti did not reasonably perceive a *significant* risk, it remains implausible that he could not reasonably perceive *any* risk.

The undersigned also briefly considers two additional relevant factors not announced in *Hudson*. First, the undersigned finds it "salient" that "[Salazar] himself [was]

---

[2] Dkt. No. 1 at 4 (Salazar alleges he "dashed [Giannotti] with toiler water and feces," with no mention of provocation by Giannotti); Dkt. No. 13 at 4 (Salazar alleges he "dashed [Giannotti] again" when he merely "seen [sic] him coming" to do his count).

largely to blame" for the events leading to the use of force. *Johnson v. Lewis*, No. 4:08CV24-P-A, 2008 WL 2510095, at *4 (N.D. Miss. June 19, 2008). Prior to July 3, Giannotti at most messed with Salazar's food slot and talked crap to Salazar. Dkt. No. 13 at 3–4. It was consistently *Salazar* who escalated the interactions to a physical level by splashing him with feces, and he continued to do so despite receiving repeated disciplinary cases. *Id.* And, as noted above, Salazar's conduct was apparently unprovoked on July 2 and July 3.

At the same time, the undersigned also finds pertinent Salazar's claim that Giannotti targeted him specifically to keep his own drug offenses off the radar. Dkt. No. 13 at 3. The undersigned notes that the allegations of drug-running appear dubious to the point of being implausible; however, accepting as true that Giannotti—for whatever reason—singled Salazar out for harassment, it becomes somewhat more plausible that he used force "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

In conclusion, the *Hudson* assessment appears to equally support and oppose Salazar's excessive force claims. The additional factors considered by the undersigned also do not tip the assessment far enough in either direction to be determinate. But returning to the substance of Salazar's claim—that Giannotti threw scalding hot coffee at him in response to admittedly disruptive behavior—the undersigned finds that the facts alleged suggest "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678–679. The undersigned thus resolves the indeterminate assessment in Salazar's favor; at this early stage of screening, it has been plausibly alleged that Giannotti used excessive force against Salazar.

## VI. CONCLUSION

For the reasons above, the undersigned RECOMMENDS that Salazar's excessive

force claims against Giannotti SURVIVE judicial screening.

## VII.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IX. TRANSFER OF CASE

Having completed the preliminary screening of Salazar's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 1:26-CV-00057-H.

ORDERED this 18th day of June 2026.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE